DAVID BALLARD, Respondent, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, April 5, 1897.

Judgment: FRAUDULENT RELEASE: CONSPIRACY: MENTAL WEAKNESS. The concerted action of the defendant's agents in securing the power of attorney to release a judgment in favor of the plaintiff who was physically and mentally in a condition of pitiable weakness, is reviewed and found to sustain the action of the trial court in setting aside the release of the judgment.

*Appeal from the Mercer Circuit Court.*—HON. PARIS C. STEPP, Judge.

AFFIRMED.

*M. A. Low* and *W. F. Evans* for appellant.

(1) When a party asks relief in a court of equity on the ground of fraud, it is necessary that the evidence adduced to establish the fraud should be clear and convincing. There is no evidence tending to show

that any person ever stated to the respondent that "he would never be able to collect said judgment," or "that the same was invalid," or "that his lawyers would cheat him out of whatever should be collected thereon." (2) Even though "the representations were made as charged, yet, unless they were acted upon by the" respondent "and he was thereby induced to" release the judgment, "he can not complain." *Parker v. Marquis*, 64 Mo. 38, 42; *Hamilton v. Mallett*, 8 Mo. App. 584; *Smith v. Dye*, 15 Mo. App. 585; 88 Mo. 581. (3) The pleadings show that the respondent received the sum of $100, as a part of the consideration for satisfying the judgment, but the evidence does not tend to show, nor is it alleged in the petition, that the respondent returned, or offered to return, the money so received, or any part of it. This being true, the present action can not be maintained. *Och v. R. R.*, 130 Mo. 27; *Barker v. R. R.*, 65 Fed. Rep. 460.

*H. G. Orton* and *Martin Read* for respondent.

(1) The plaintiff is of that class who by reason of weakness of mind is entitled to the special protection of the court. The advantage the defendant got over him was solely by reason of his weak mind. But for his weak mind he would not have believed the story of Bloom, Griffey and Cook, of promised employment and pension. Story [8 Ed.], sec. 234–239; Bispham's Eq. [Enlarged Ed.], sec. 230; *Allore v. Jewell*, 4 Otto (U. S.), 511; *Mitchell v. Jones*, 50 Mo. 438; *Dickenson v. Kempmsky*, 96 Mo. 259, and cases cited. (2) Griffey, who procured the statement, stood in a confidential relation to plaintiff; had been his adviser and used his influence as such to the detriment of plaintiff. (3) The promises made by Bloom and Griffey as well as the "assurances" by Cook were

fraudulent because they had no authority to promise a life job or a pension from the defendant, and because they well knew that the plaintiff could do no work. (4) The defendant can not deny responsibility for the acts of Bloom and Griffey. It took advantage of their work. *Baldwin v. Whitcomb*, 71 Mo. 658; *Cass Co. v. Green*, 66 Mo. 512; *Henderson v. Henderson*, 55 Mo. 559; *Goldsby v. Johnson*, 82 Mo. 605; *Hedrix v. Beeler*, 110 Mo. 100; *Oult v. Alson*, 34 Minn. 450. (5) The plaintiff made no point in the trial court that the $100 paid to plaintiff was not tendered back, and the correct judgment of the court which gave to defendant the benefit of the $100 paid by Griffey should not be set aside for that reason. R. S. 1889, sec. 2100, 2303. (6) When the action of the defendant shows that the tender would not have been received, it is not necessary. This was the position of the defendant as it claimed the release of the judgment was valid. *Whelan v. Reilly*, 61 Mo. 565. (7) In this case the $100 was not the subject of tender for it belonged to plaintiff, whatever the result of the suit. *Kley v. Healy*, 27 N. E. Rep. (N. Y.) 595, and cases cited. *State ex rel. v. Jones*, 53 Mo. App. 220; *Gerard v. Car Wheel Co.*, 46 Mo. App. 116.

ELLISON, J.—The plaintiff in this case obtained judgment in 1892 against defendant for personal injuries received by him. That judgment was affirmed in this court; a report thereof will be found in 51 Mo. App. 453. Afterward the defendant obtained from plaintiff a power of attorney to one Trotter, authorizing him to satisfy such judgment, which was done. Plaintiff afterward instituted this action in equity to set aside the entry of satisfaction and to restore the judgment to its original force and effect, on the ground that the power of attorney had been procured from

him by the fraud, chicanery, and deceit of defendant's agents. The circuit court found the issues for plaintiff, cancelled the satisfaction and restored the judgment to its original force, less a credit of $100 which it appears had been paid plaintiff as a part of the general scheme which had resulted in his executing the power of attorney. Defendant has appealed.

The case being in equity we have examined the evidence presented and find the appeal to be without merit. Plaintiff was shown to be of weak mind, easily influenced and imposed upon. He could not read or write. He was, however, before his injuries, a strong man physically. It appears that he was a laborer in the employ of defendant before his injury and that for a few days after the accident in which he was hurt he went about, but grew worse until at the time the evidence in the present record was taken his physical condition was such that he had scarcely any use of his legs, besides being practically helpless in other ways. It was in this condition of mental and physical helplessness that he was set upon by different parties, one of them being the station agent of defendant at Princeton, Missouri, with a view of getting rid of the judgment he had obtained. There was prepared for him and he was persuaded to sign (by making his mark) a sworn statement, in which he is made to say that he was not injured by the defendant company in the accident when he jumped from the train. That his injuries were the result of rheumatism. That he was influenced by his attorney to bring the suit and that he made the statement of his own free will. To induce him to sign this paper he was told that the defendant company would employ him at $30 per month as long as he lived and give him $100. He was told that the

JUDGMENT: fraudulent release: conspiracy: mental weakness.

company would pension him whether he worked or not.

In this case, as in most cases where a concerted fraud is being practiced there are several matters upon which there is no direct testimony. This arises in this case principally for the reasons that Griffey and Bloom, the two parties who were manipulating the affair in Missouri, though present in the court room, failed to go upon the witness stand. At any rate, in a few days after plaintiff signed the aforesaid statement he is found at a hospital in Davenport, Iowa, but what person took him there does not appear. It is clear enough however—it is indeed practically conceded—that the defendant's agents induced him to go there. In Iowa, at a hospital in Davenport, he is interviewed by other agents of defendant, confronted with the affidavit which he had made in Missouri and told that an injunction would be gotten out in the district court there to enjoin him from collecting his judgment down in Missouri. It does not appear how defendant's agents in Davenport knew that plaintiff was at the hospital in Davenport, ready to be enjoined, but certain it is, they ascertained the fact and made three visits to him at the hospital. At the first visit plaintiff is said to have expressed contrition for his conduct and he was told then and there by Mr. Cook, defendant's attorney at Davenport, that he would be enjoined. At the second visit Mr. Cook took out and served on plaintiff a notice for an application for a temporary injunction. On the occasion of this second visit it seems that plaintiff was again reminded of his Missouri affidavit and what followed at this and the third visit is best told by Mr. Cook himself, who in all his testimony showed a desire to state fully and candidly his entire connection with the matter so far as he knew anything of it. He said in testimony that:

"The man's condition and evident ignorance appealed to me so strongly that I said to him the proceedings I had begun would result in exposing his perjury and infamy, and that I was disposed to dismiss those proceedings if he desired it, but that in that case I wanted him to give a power of attorney to some one here in Davenport to release the judgment in Mercer county. He readily promised to do this. I then went to the hospital a third time, in company with Dr. M. E. Trotter of this city, and one E. F. Guy, a notary public. I took with me a statement for Ballard to sign, and also a power of attorney to M. E. Trotter, ready for Ballard to execute. I asked Mr. Ballard if he desired to have any one present representing him, and he said he would like to call in Mr. Nash. Mr. Nash came in and was present during the interview that followed. I asked Mr. Ballard to sign the statement that I had brought out and the power of attorney to Mr. Trotter, and handed these papers to Mr. Nash for him to read over. Mr. Nash immediately informed Ballard that he signed away every right he had against the railroad company, and advised him not to sign those papers. I then explained to Mr. Nash that I had an affidavit from Ballard in which Ballard admitted having perjured himself on the trial of the case in which the judgment in question was secured; that I did not care whether Ballard signed the papers or not. I said to Mr. Nash that I had taken this course out of pity for Mr. Ballard and to avoid exposing him, and that I had done so because I believed he was too ignorant to fully understand the crime of which he admitted being guilty, and because his physical condition was pitiful, and that I did not want to follow or persecute him in any way.

"Mr. Nash then asked me what Ballard would get from the railroad company. I told him that he would

Vol. 70 app—8

have no claim whatever against the railroad company if he signed these papers. Along about that point in the conversation Mr. Ballard broke in and said to Mr. Nash, that he understood the matter and that he wanted to sign the papers, and Mr. Nash said, well, he said, 'You cooked your goose.' He said: 'You ought never to have signed any papers, but under the circumstances I think you had better sign these;' that was the substance of Mr. Nash's statement to him. I then said to Mr. Nash, while in Mr. Ballard's presence and in the presence of Mr. Trotter and Mr. Guy, that the company had brought Ballard here to put him to work at flagging, and that when he was well enough to work again, if he ever was, the company expected to give him a position at a crossing, and that position was likely to be a life's job for him. Mr. Nash said, 'Why don't you make a contract with him to that effect? Why don't you let some of these papers show that?' I said the company does not intend to make any contract with Mr. Ballard, and does not make any; they never would make a contract with any man binding themselves to employ him, but they expect to employ him while he is able to work. I said he is not releasing this judgment because of the employment he is going to get; we are permitting him to release the judgment instead of proceeding against him by law and making him trouble. If we put him at work flagging, it will only be because the company feels he has tried to be square with them. Mr. Nash shook hands with me before I left the hospital, and expressed himself to the effect that he was pleased with the course I had taken in the matter, and asked me to overlook his apparent interference in it, and that he had not understood it, and that now he fully understood the position of Ballard in the way I had gone about it, and he thanked me for taking that course, in Mr. Ballard's behalf.

Mr. Ballard, I think I omitted to say, signed the statement and the power of attorney that I had taken out to the hospital with me, and the power of attorney was delivered to Mr. Trotter by Ballard in the presence of Mr. Guy, Mr. Nash, and myself. The statement which he signed he delivered to me, and I retained it until it was attached to Mr. Trotter's deposition in the suit brought by Ballard against the company some time last fall. * * * He impressed me as a man of great ignorance and of feeble mind in the sense of lacking much intellect. He certainly did impress me that way. It was largely on that ground that I discontinued my suit against him, feeling sorry for him. Of course I can not say whether his mind was enfeebled from any disease."

It was at the time of executing the power of attorney to Trotter that plaintiff signed a second statement of *considerable* length which had been prepared for him in which appears references to what he alleged in his petition when suing for his injuries. He tells of "issue having been joined" and the day "the case came on for trial" of his getting judgment with interest at six per cent. That he had "become convinced that such infirmity is not the result of jumping from the work train," but was caused by rheumatism. That his testimony at the trial was "erroneous," though he believed it to be true. That his attorneys had not influenced him to bring the suit, or encouraged him to swear to anything they believed to be untrue. That "I am simply convinced that I was mistaken at that time (time of trial) as to the nature of my bodily infirmity." He then recites that being convinced that he should not have obtained judgment, he has that day executed a power of attorney to Trotter, empowering him to satisfy the judgment. He then signs, by mark, and swears to the truth of this last statement. The

material difference between the last statement and the first is that in the first he is practically made to confess that he got his judgment for the injuries through perjury and that he had been persuaded thereto by his attorneys, whereas in the last one, he is made to place the cause of his injury as rheumatism and that he was mistaken at the trial and that he had not been led into the case by his attorneys.

It will serve no useful purpose to further comment on the testimony further than to say that it plainly appears that plaintiff was of weak mind, that he had scarcely any memory, that he could not learn his letters, that he was a subject easily imposed upon, that his condition was one of "pitiful" weakness in mind and body and that in this condition he was taken in charge by various agents for defendant for the purpose of getting a release of his judgment by fraudulent and deceitful practices. The circuit court could not have found otherwise than it did.

In reply to a statement at the argument of plaintiff's counsel that Griffey and Bloom, though present at the trial, had not taken and were not asked by defendant to take the stand as witnesses, defendant's counsel said that whatever there was in that fact was offset by plaintiff not going on the stand. We do not accept that view of the matter. It is apparent to one who reads over the testimony that plaintiff's condition of mind was and had been such as to render his testimony of little value on the subject of transactions so complicated and involving so much of deception as developed here. The same reason does not apply to Bloom and Griffey. The latter, as was alleged, had been and pretended to be plaintiff's friend. Each rested in silence under the charge made by the petition supported by testimony and the defendant seems to have been content that they remain silent.

The judgment is affirmed. All concur.